UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

---

RUSSELL GEY
7565 South Lenox Avenue
Oak Creek, Wisconsin 53154

       Plaintiff,

    v.                                   Case No.: 17-cv-879

VMH INTERNATIONAL, INC.             **JURY TRIAL DEMANDED**
635 Trade Center Boulevard
Chesterfield, Missouri 63005

       Defendant.

---

## COMPLAINT

---

COMES NOW Plaintiff, Russell Gey, by his counsel, WALCHESKE & LUZI, LLC, as and for a claim against Defendant, alleges and shows to the Court as follows:

1.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this case involves a federal question under the Americans with Disabilities Act ("ADA"), as amended by the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA"), 42 U.S.C. §§ 12101, *et. seq.*

2.    The unlawful employment practices of which Plaintiff complains occurred within the Eastern District of Wisconsin and therefore venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c).

3.    Plaintiff, Russell Gey, is an Adult male resident of the State of Wisconsin residing in Milwaukee County with a post office address of 7565 South Lenox Avenue, Oak Creek, Wisconsin 53154.

4.      Defendant, VMH International, Inc., was, at all material times herein, a foreign corporation with a principal office address of 635 Trade Center Boulevard, Chesterfield, Missouri 63005.

5.      On or about April 3, 2017, Defendant hired Mr. Gey as its Director/Vice President of Sales.

6.      During his employment with Defendant as its Director/Vice President of Sales, Mr. Gey reported directly to Vern Heyer, President.

7.      During his employment with Defendant as its Director/Vice President of Sales, Mr. Gey primarily worked out of his home office in Oak Creek, Wisconsin.

8.      During Mr. Gey's employment with Defendant as its Director/Vice President of Sales, Defendant compensated him with an annual salary of $120,000 plus commissions.

9.      Mr. Gey suffers from a variety of physical health conditions, including Coronary Heart Disease, Type II Diabetes, and high blood pressure.

10.     Mr. Gey's physical health conditions, including Coronary Heart Disease, Type II Diabetes, and high blood pressure, are permanent, irreversible, physical health conditions that substantially and negatively affect his organ function, endocrine function, and his ability to eat, sleep, perform manual tasks or physical activities, and, at times, work.

11.     On May 17, 2017 and while Mr. Gey was receiving a routine physical for his life insurance policy, medical personnel discovered that his blood pressure was dangerously high and informed Mr. Gey that he needed to be admitted to a hospital immediately. Mr. Gey immediately went to an urgent care clinic in Oak Creek, Wisconsin, where he was informed that he was suffering from a "Walking Stroke": Mr. Gey had no physical symptoms or manifestations of a stroke or a heart attack (yet), but it could happen at any time, virtually instantaneously, unless he was

immediately medically tested, monitored, and administered prescription medication. Mr. Gey was informed that the likely factors contributing to his "Walking Stroke" were genetics, his Coronary Heart Disease, his Type II Diabetes, his high blood pressure, stress, and/or his lifestyle.

12.     On the afternoon of May 17, 2017, Mr. Gey and Heyer spoke via telephone (hereinafter simply "the May 17, 2017 telephone conversation").

13.     During the May 17, 2017 telephone conversation, Mr. Gey told Heyer that he was seen in the urgent care clinic earlier that day, that he was experiencing "an emergency situation," that he needed to be off of work and resting for the remainder of the day, and that he was going back to the urgent care clinic the following day for additional medical testing.

14.     On May 18, 2017, Mr. Gey checked-in to the urgent care clinic in Oak Creek, Wisconsin for medical testing related to the physical health issues as described in Paragraph 11, above.

15.     On May 18, 2017 and after the medical testing was completed, Mr. Gey was informed that he needed to be off of work for approximately one (1) week in order to rest and to significantly reduce his stress/blood pressure. Mr. Gey was informed that if he did not take his medications as prescribed, did not follow the physicians' instructions, did not take off of work for approximately one (1) week, and/or was unable to immediately and significantly reduce his stress/blood pressure, he could or would suffer a major stroke and/or heart attack.

16.     As a result of the physical health issues as described in Paragraph 11, above, and the medical testing that was performed on Mr. Gey as described in Paragraph 14, above, Mr. Gey was prescribed the following medications: two different blood pressure medications; a triglyceride reduction medication; a cholesterol medication; and flaxseed, multivitamins, and a probiotic. Mr. Gey was not prescribed and/or did not have to take these medications prior to May 17, 2017, and

was instructed to indefinitely take these medications and follow his physicians' instructions until his condition significantly improved.

17.    At 10:29 a.m. on May 18, 2017, Heyer received an email from Mr. Gey with the subject line, "Work leave," which stated, "Please see attached doctor's orders." Attached to this email was correspondence from Mr. Gey's treating nurse, dated May 18, 2017, stating, "This is to certify that Russell was seen in the clinic on 5/18/2017. Please excuse Russell from work 5/18/[2017] thru 5/26/2017."

18.    At 12:41 p.m. on May 18, 2017, Heyer responded to Mr. Gey's email as identified in Paragraph 17, above, stating: "Thanks for the note, and I understand. Is there anything I need to do next week while your [sic] off?"

19.    On May 18, 2017 and after Heyer's 12:41 p.m. email to Mr. Gey as identified in Paragraph 17, above, Heyer called Mr. Gey via telephone (hereinafter simply "the May 18, 2017 telephone conversation").

20.    During the May 18, 2017 telephone conversation, Mr. Gey and Heyer discussed Mr. Gey's health condition(s).

21.    During the May 18, 2017 telephone conversation, Mr. Gey specifically told Heyer, among other things: "We got lucky. I have a 'Walking Stroke.' I have no symptoms of a stroke or a heart attack but my blood pressure is off the charts. They want to put me in the hospital. I have to take it easy for a few days with no stress otherwise I can 'stroke out' or have a heart attack at any time," or words to that effect.

22.    During the May 18, 2017 telephone conversation, Mr. Gey informed Heyer that there was nothing urgent Heyer needed to do next week while he (Mr. Gey) was off of work.

23.     On the morning of May 19, 2017, Heyer attempted to contact Mr. Gey multiple times regarding matters pertaining to Defendant's business and/or Defendant's clients, including leaving Mr. Gey a voicemail message on Mr. Gey's cell phone.

24.     At 10:53 a.m. on May 19, 2017, Heyer received an email from Mr. Gey, stating, in part: "…I have already forwarded doctors' instructions. I don't believe you're grasping the severity of the situation. I'm to engage in no stress-related activities or communications for the next several days in any form. ..."

25.     At 10:59 a.m. on May 19, 2017, Heyer sent an email to Mr. Gey, stating: "I understand the stress is too much, and all I was going to do is to let you know this role isn't worth it. We all want you to be healthy and take care of your family, so please take care of yourself. For that reason, please be advised this will serve as your two week notice. We will adhere to our agreement, but this job isn't worth your health. We all wish you the best, and hope you get better."

26.     On May 19, 2017, Heyer terminated Mr. Gey's employment.

27.     Subsequent to May 19, 2017, Mr. Gey had (and continues to have) multiple follow-up visits with his treating physician(s) for the physical health issues as described in Paragraph 11, above. Mr. Gey continues to take (and will continue to take) prescription medication and follow his physicians' instructions until the physical health issues as described in Paragraph 11, above, significantly improve.

28.     Subsequent to his termination from Defendant, Mr. Gey filed a complaint with the Equal Employment Opportunity Commission – Milwaukee Area Office ("EEOC"), designated as EEOC Charge No. 443-2017-00977, alleging disability discrimination as a result of Defendant's unlawful termination of him based on this disability or disabilities and its failure to accommodate his disability or disabilities.

29.     The EEOC issued Mr. Gey a Notice of Right to Sue on Charge No. 443-2017-00977, dated June 15, 2017.

30.     Mr. Gey exhausted all administrative remedies and filing requirements prior to bringing this action.


## CAUSE OF ACTION – DISABILITY DISCRIMINATION

31.     Mr. Gey re-alleges and incorporates paragraphs 1-30 of this Complaint by reference.

32.     Defendant intentionally discriminated against Mr. Gey by terminating his employment because of his disability or disabilities, in reckless disregard for his federally protected rights under the Americans with Disabilities Act, as amended by the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. §§ 12101, *et. seq*.

33.     Defendant intentionally discriminated against Mr. Gey by terminating his employment because it perceived him to be disabled, in reckless disregard for his federally protected rights under the Americans with Disabilities Act, as amended by the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. §§ 12101, *et. seq*.

34.     Defendant intentionally discriminated against Mr. Gey by failing to reasonably accommodate his disability or disabilities, in reckless disregard for his federally protected rights under the Americans with Disabilities Act, as amended by the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. §§ 12101, *et. seq*.

35.     As a result of Defendant's intentional discrimination, Mr. Gey suffered damages in the form of lost wages and benefits, emotional distress, pain and suffering, and attorneys' fees and costs.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

1. Order Defendant to make Plaintiff whole by providing appropriate back pay, front pay and/or reinstatement, compensatory damages, punitive damages, pre-judgment and post-judgment interest, and reimbursement for other benefits and expenses in an amount to be shown at trial;

2. Grant to Plaintiff attorneys' fees, costs, and disbursements as provided by statute; and

3. Grant to Plaintiff whatever other relief this Court deems just and equitable.

**PLAINTIFF DEMANDS A JURY AS TO ALL TRIABLE ISSUES.**

Dated this 26th day of June, 2017.

WALCHESKE & LUZI, LLC
Counsel for Plaintiff

s/ *Scott S. Luzi*_____
James A. Walcheske, State Bar No. 1065635
Scott S. Luzi, State Bar No. 1067405
Jesse R. Dill, State Bar No. 1061704
Kelly L. Temeyer, State Bar No. 1066294

WALCHESKE & LUZI, LLC
15850 W. Bluemound Road, Suite 304
Brookfield, Wisconsin 53005
Phone: (262) 780-1953
Fax: (262) 565-6469
jwalcheske@walcheskeluzi.com
sluzi@walcheskeluzi.com
jdill@walcheskeluzi.com
ktemeyer@walcheskeluzi.com